IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

    v

MARCUS WHITFIELD,

    Defendant.

No   CR-07-366 VRW

ORDER

        Marcus Whitfield ("Whitfield") moves to suppress a firearm seized on April 29, 2007 from underneath a mattress pursuant to a warrantless probationary search.  Whitfield is charged in a two count indictment with possessing ammunition and a firearm in violation of 18 USC § 922(g)(1).  Doc #10 at 1.  The court received written briefs and declarations and heard oral argument on August 28, 2007.  For the reasons that follow, the court DENIES his motion to suppress the evidence.

//

//

//

I

Since June 22, 2006, Whitfield has been on state probation following a guilty plea to narcotics possession earlier that month. Doc #10 Ex E at ¶¶5-6. Four days later, Whitfield was transferred to the California Youth Authority in connection with a "parole revocation," Doc #10 Ex A at ¶10, stemming from a series of other offenses. Following five months CYA custody, Whitfield was placed on parole on November 8, 2006. Thus, at all times relevant here, Whitfield has been supervised by both probation and parole authorities.

In the early morning on April 28, 2007, Cavia Daniels ("Daniels") flagged down two police officers in the Sunnydale district of San Francisco. Id at 3. Daniels stated she had just been involved in an argument with her boyfriend, Whitfield, at a residence one block away at 1855 Sunnydale Avenue. Doc #9 at 2. According to the police, she told them Whitfield "grabbed her by her sweatshirt and dragged her out of the residence," "grabbed her head with both of his hands and threw her to the ground" and tried unsuccessfully to bite her ear. Doc #10 Ex G at ¶4. The police incident report relates that Whitfield took her cell phone to prevent her from calling 911. Doc #9 Ex B; id Ex C at 4. One of the officers also noted that Daniels was visibly pregnant that day and stated that she said she was carrying Whitfield's child. Doc #10 Ex G at ¶6. She further stated, according to Officer Jessie Ortiz, "that Whitfield had physically abused her in the past and in January of 2007 he broke her arm." Id at ¶7. During her

2

conversation with the police, Daniels reported that Whitfield owned a gun and kept it underneath his mattress inside "his house at 1855 Sunnydale Avenue." Id at ¶8. She described it as a "full automatic Tech 9." Id.

Also according to the police, "Daniels stated that sometimes Marcus Whitfield stays at 1855 Sunnydale Avenue and sometimes he stays with her at 967 Drake Avenue." Id at ¶11. She further stated that Whitfield "is on parole and should be living at Drake and he shouldn't be out of Marin County, but he's been staying at 1855 Sunnydale with his mom." Id at ¶12. The police offered to take Daniels to the hospital, but she declined and instead drove herself. Doc #10 Ex G at ¶13.

The police then conducted two computer checks on Whitfield. Id at ¶14. The first check listed his probation address as 1855 Sunnydale Avenue. Id. The second check listed his parole address as 967 Drake Avenue in Sausalito, California. Id.

Whitfield had provided the 1855 Sunnydale address to his probation officer as late as March 13, 2007. Id Ex E at ¶13. In a number of subsequent voice messages to his probation officer, Whitfield failed to state that his address had changed. Id at ¶14. The probation officer states "[t]he only home address that has ever been on file with the Probation Department for Marcus Whitfield has been 1855 Sunnydale Avenue, San Francisco, CA." Id at ¶16.

Meanwhile, Whitfield's parole officer never dealt with a residence at 1855 Sunnydale. Instead, Whitfield had reported his address to parole as 943 Drake Avenue in Sausalito, and the parole officer conducted numerous successful home visits there. Id Ex A

3

at ¶¶14, 16. On April 9, 2007, a home visit at 943 Drake was unsuccessful; the parole officer contacted Whitfield, who stated, "Oh, I thought I told you that I moved to 967 Drake." Id at ¶17. The parole officer then updated Whitfield's records to reflect his new home address of 967 Drake Avenue. Id at ¶18.

The police officers, for their part, had the computer search reports that showed the 1855 Sunnydale address and the 967 Drake address. Doc #10 Ex G at ¶14. The officers decided to visit the 1855 Sunnydale location to speak with Whitfield about the domestic violence incident. Id Ex G at ¶15. Whitfield's mother, Jenice Colvin, answered the door. Id at ¶16. She stated, "Marcus doesn't live here." Doc #10 Ex G at ¶16. The officers then met Daniels at the hospital, where they assisted her in obtaining an emergency protective order.

The following day, one of the officers who had first responded to Daniels's domestic violence situation spotted Whitfield, arrested him and took him to the police station. Id Ex H at ¶3-6. After making the arrest, the police searched Whitfield's files, which turned up his probation address, 1855 Sunnydale. Id at ¶9. The search also revealed he was on felony probation and subject to a warrantless search condition. Id.

Four police officers then conducted a search of the 1855 Sunnydale apartment. Id Ex M at 4. The facts surrounding the search are in dispute. Both parties agree that Whitfield's younger sister, fifteen-year-old Donecia Colvin, was at home alone on the night of the arrest and that she was upstairs in her bedroom when the police arrived. The government contends that when the officers

4

knocked on the door, she popped her head out of the window and, when asked by police to come downstairs to talk, she replied, "yeah ok." Doc #10 Exs H, J. According to the government, the police then conversed with her because they observed she was a minor home alone. Id. When the police asked where Whitfield slept, she pointed to the room upstairs. Id. According to the government, Officer Campos then asked her "if she would mind showing him where Marcus sleeps," to which Colvin allegedly replied, "come on I'll show you." Id. Once inside the bedroom, the government contends the officers asked her to do them a "favor" and to lift the mattress. Id. The police then discovered the gun as Daniels had described, along with a magazine of ammunition. Id Ex I at ¶12.

Whitfield offers a different account. Whitfield asserts the officers came to the door with their hands on their guns. Doc #9 Ex D at ¶3. Donecia's declaration states the police demanded that she come downstairs because they needed to search the house: "I let the police into the house because I was scared and because the police told me to let them in to search the house." Id at ¶3. The officers then instructed her to lead the way upstairs. See id at ¶5. Whitfield states that the police ordered her to lift the mattress, that she declined at first, and then eventually complied with the request. See id.

After the search, the police booked Whitfield at the station. See Doc #10 Ex I at ¶16. He stated his home address was 943 Drake Avenue. See Doc #10 Ex H at ¶7. The police's fingerprint expert determined that fingerprints on the gun and ammunition matched Whitfield's. See id Ex M.

5

In his motion to suppress, Whitfield argues the police lacked probable cause to believe Whitfield lived at 1855 Sunnydale Avenue.  If the probationary search was invalid, then the police would require consent to search the house, and Whitfield contends consent was lacking in this case.  The court finds the police had probable cause to search 1855 Sunnydale.

## II

### A

"The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or search for specific objects."  <u>Illinois v Rodriquez</u>, 497 US 177, 181 (1990).  Police do not need a warrant, however, if the defendant is subject to warrantless searches as a condition of probation as long as the search is supported by reasonable suspicion.  See <u>United States v Knights</u>, 534 US 112, 122 (2001).  Because of Whitfield's prior convictions, Whitfield is subject to a probation order issued on June 22, 2006 and set to expire on June 21, 2009.  One of the conditions of his probation is that he "is subject to a warrantless search condition, as to defendant's person, property, premises and vehicle, any time of the day or night, with or without probable cause, by any peace, parole or probation officer."  Doc #10 Ex C.  Whitfield's parole also subjected him to a warrantless search condition.  Doc #10 Ex A at ¶12.

//

B

The question in this case is whether the police were entitled to treat 1855 Sunnydale Avenue as Whitfield's residence for the purpose of a warrantless search. Whitfield argues the address was invalid because the police had strong reason to believe he did not live there. The government responds that 1855 Sunnydale was in the computer system, was the only address Whitfield ever gave to his probation officer and the statements at the scene confirmed that Whitfield resided there.

This case presents the reversal of the common scenario in probationary search cases. Whereas defendants usually challenge a search on the grounds that the police searched an "unofficial" address rather than the address properly on file, Whitfield claims his "official" address on file – or, at least, one of them – was incorrect and the police knew or should have known it was incorrect and, therefore, have avoided a search of that location without a warrant. Whitfield, of course, had more than one "official" address, albeit one a probation address and the other a parole address. Here, the key issue is whether the police had authority to search 1855 Sunnydale once they found two addresses on file for Whitfield's residence in light of the conflicting information at the scene regarding where he lived.

In 2005, the Ninth Circuit clarified the standard for cases in which a probationer's address is in dispute: "[B]efore conducting a warrantless search pursuant to a parolee's parole condition, law enforcement officers must have probable cause to

7

believe that the parolee is a resident of the house to be searched." Motley v Parks, 432 F 3d 1072, 1080 (9th Cir 2005) (en banc). The distinction between parolees and probationers is irrelevant for Fourth Amendment purposes. See United States v Harper, 928 F 2d 894, 896 n1 (9th Cir 1991). In determining whether the police had probable cause, the Motley court conducted a detailed inquiry into the facts known to the police at the time of the search. Motley, 432 F 3d at 1080-81. The court further concluded that once officers have probable cause to believe they are at the probationer's residence, they are "entitled to maintain that belief until 'presented with convincing evidence that the information they had relied upon was incorrect.'" Id at 1082 (quoting Moore v Vega, 371 F 3d 110, 118 (2d Cir 2004). The Second Circuit in Moore explicitly declined to impose a probable cause requirement like the one crafted in Motley, opting instead for a less-stringent reasonableness approach. See Moore, 371 F 3d at 117-18. The Ninth Circuit nevertheless borrowed Moore's "convincing evidence" standard. This is presumably because the "convincing evidence" standard only strips the police of authority to search once that authority has vested, without regard to the standard by which that authority vests. In this sense, the convincing evidence standard is only a mode of subtraction. It does not affect the question here, which is whether the police ever had probable cause in the first place.

The Ninth Circuit recently elaborated upon Motley's probable cause standard, describing it as a "relatively stringent" requirement: "It is insufficient to show that the parolee may have

8

spent the night there occasionally. Instead, the facts known to the officers at the time of the search must have been sufficient to support a belief, in 'a man of reasonable caution,' that [the defendant] lived at [the search address]." United States v Howard, 447 F 3d 1257, 1262 (9th Cir 2006) (quoting Texas v Brown, 460 US 730, 742 (1983).

Howard, however, does not control here. In Howard, the defendant moved to suppress evidence obtained from a probationary search of an address not on file. 447 F 3d at 1258. One month after the defendant Howard was placed on supervised release, he began a relationship with Tammi Barner. Id at 1259. Because Barner was a convicted felon, Howard needed his probation officer's permission to continue the relationship. The officer met with Barner, who told the officer she lived at 2221 West Bonanza, apartment 49. The officer denied permission for Howard to live at that address. Id. Nine months later, the probation officer received a phone call from a confidential informant who stated Howard was staying somewhere in the massive 2221 West Bonanza apartment complex and that he had a firearm hidden there. Id. The officer conducted an investigation and became concerned that Howard was using an unreported address, probably Barner's, to engage in criminal activity. Id. After another tip from the informant that Howard was staying at West Bonanza, the police conducted surveillance at West Bonanza for approximately one month, but they never observed Howard there. Id at 1260. The probation officer then secured an order from the probation department to search both the West Bonanza address as well as Howard's official address. Id.

9

Just before conducting the search early in the morning, the search team watched Howard leave Barner's apartment. Id at 1261. When the police confronted Barner, she stated Howard did not live in her apartment and did not have a key. Id. After she left, the apartment owner let the police into the apartment, where they seized Howard's gun. Id.

In concluding the police lacked probable cause to believe Howard resided at 2221 West Bonanza, the Ninth Circuit synthesized a test from the holdings in four similar cases, each of which involved a probationary search at an unreported address: United States v Dally, 606 F 2d 861 (9th Cir 1979); United States v Harper, 928 F 2d 894 (9th Cir 1991); United States v Watts, 67 F 3d 790 (9th Cir 1995); and United States v Conway, 122 F 3d 841 (9th Cir 1997). Howard used those cases to develop an expanded multifactor probable cause inquiry. The court listed the factors as: (1) whether "the parolee did not appear to be residing at any address other than the one searched," id; (2) whether the police "had directly observed something that gave them good reason to suspect that the parolee was using his unreported residence as his home base," id at 1265-66; (3) whether the parolee had a key to the unreported residence, id at 1266; and (4) whether the parolee's co-resident or the parolee himself identified the unreported address as his own residence, id. Whitfield argues this multifactor inquiry, particularly factors (1) and (4), applies here and supports a finding of no probable cause.

But Howard suggests, if not states outright, that its analysis applies only if the police are searching an unreported

10

address: "In considering the cases where this Court upheld the search of an address not reported by a parolee – i e, Dally, Harper, Watts, and Conway – certain patterns emerge." Id at 1265. In a footnote appended to that sentence, Howard rejects Motley because the police there were searching the parolee's last known address. See id at 1265 n10; see also id at 1264 n9 ("The facts of Motley are sufficiently different from those presented here that it is not of much use for comparison purposes.").

The distinction makes sense. Whenever the police search an "unofficial" address based on surveillance or an informant's tip, the officers should have a heightened duty to investigate whether the probationer actually resides there. The police must test the validity of the unreported, unofficial, speculative address. By contrast, if the probationer has come out and told the authorities that he resides at a particular address, then the authorities would not seem to have a duty to confirm that the reported address is, in fact, the probationer's address. If the police had to re-investigate the address on file before conducting every probationary search, their efforts would be unduly duplicative and wasteful. For this and other reasons, probationers must inform their probation officers of any address change. This does not mean that police have carte blanche to search a listed address simply because it is listed. And the court in no way wishes to suggest that police can simply ignore evidence that a probationer lives at an address other than his listed address. But the analysis Whitfield urges gives an official, listed address essentially zero weight. That approach cannot be correct.

This case is far closer to Motley than to Howard. In Motley, the ATF conducted a warrantless parole search of what they believed was Jamerson's residence. See Motley, 432 F 3d at 1076. Unbeknownst to the ATF, Jamerson had been taken back into custody on a parole violation, and accordingly he no longer resided at the address. Id at 1075. When the ATF conducted the search, the resident (Motley) told them Jamerson was in custody and did not reside there. Id at 1076. Not believing her, the ATF forced its way in, and Motley brought a § 1983 claim. Id at 1077. To determine whether the ATF had probable cause to believe Jamerson resided there, the court recounted all the facts known to the ATF. The officers stated they relied on information received from the LAPD regarding Jamerson's last known address. Id at 1080. In addition, one officer stated he "had contact with Jamerson on previous occasions, including at the [residence searched]. During at least one of those prior interactions, Jamerson and his grandmother confirmed that Jamerson lived at the location at issue." Id at 1080-81. Based on those facts, the court concluded the officers' reliance on the information was "objectively reasonable" and they had probable cause to believe Jamerson resided at the searched address. Id at 1082.

Here, if the only address the police had on file for Whitfield had been 1855 Sunnydale Avenue, Motley would be essentially dispositive. See Motley, 432 F 3d at 1080-81. Because the police had two different addresses on file depending on which database was queried, the case is not quite so simple.

//

**12**

C

The question is whether the officers ever had probable cause to believe Whitfield resided at 1855 Sunnydale Avenue. Because the facts here are intricate and contradictory, the court will re-present the relevant circumstances as clearly as possible, in chronological order as they became known to the police.

First, during the initial investigation of Daniels's domestic violence complaint, Daniels told the police where Whitfield lived, but the parties disagree whether she said Whitfield lived on Sunnydale or Drake (or both or neither). Daniels claims she told the police she and Whitfield lived together at 967 Drake Avenue in Marin City. See Doc #9 Ex A at ¶2. The defense further claims the police's own records corroborate her statement: The "Report of Investigation" dated June 1, 2007, states Daniels told police that the house at 1855 Sunnydale belonged to his parents and that he only "sometimes stayed" there. Doc #10 Ex M. The "Report of Investigation" was prepared by Michael L. Kelly, Task Force Officer, San Francisco Metro Field Office. Officer Kelly does not appear to have been present when Daniels made the statement – the only officers present were Officers Ortiz and Anderson.

The government responds that Daniels told the police that Whitfield "lived" at 1855 Sunnydale. Doc #10 Ex G at ¶15 ("Based on Ms Daniels's statements that Whitfield lived at 1855 Sunnydale * * * ."); see id at ¶3 ("Ms Daniels stated she went to her boyfriend's house at 1855 Sunnydale Avenue * * * ."); id at ¶8 ("Ms

13

Daniels stated that Whitfield [has a gun] underneath his mattress at his house located at 1855 Sunnydale Avenue."); Doc #9 Ex B (Emergency Protective Order) ("Cavia Daniel stated that Marcus Whitfield * * * dragged her out of his apartment * * * .") Other recollections of the conversation are equivocating or ambiguous. See Doc #10 Ex G at ¶11 ("Ms Daniels stated that sometimes Marcus Whitfield stays at 1855 Sunnydale Avenue and sometimes he stays with her at 967 Drake Avenue."); id at ¶12 ("Ms Daniels stated that Marcus Whitfield is on parole and should be living at Drake and he shouldn't be out of Marin County, but he's been staying at 1855 Sunnydale with his mom.").

The parties attach undue significance to the use of the word "stayed" versus "lived." That distinction might have legal significance for Fourth Amendment purposes, but it is unclear whether individuals in ordinary usage make similarly granular distinctions, especially when under stress (such as speaking to the police immediately after being attacked by one's boyfriend). Accordingly, not only is the testimony in conflict, but the dispute may be overly semantic. If this evidence shows anything at all, it shows that out of all the addresses in the world, Whitfield resided at either 967 Drake or 1855 Sunnydale.

Next, the officers conducted two computer searches of Whitfield's files and received conflicting information on his residence. One of the computer searches listed 1855 Sunnydale as Whitfield's probation address. Id at ¶14. The other search queried a different database, which showed that Whitfield was on parole and that his parole address was 967 Drake Avenue. Id. The

14

searches showed that the most recent conviction was the felony conviction which resulted in probation. Id.

Although the differing search results might be viewed as "cancelling out," that intuition is incorrect. The test cannot be binary. Such an approach would imply that if the police were fifty-one percent certain that Whitfield lived at a particular address, then they would have probable cause for that address but not the other. The Supreme Court, however, has rejected such efforts at quantification. See Maryland v Pringle, 540 US 366, 371 (2003); see also United States v Gourde, 382 F 3d 1003, 1015 (9th Cir 2004) (Gould, J, concurring) (collecting cases), affirmed en banc, 440 F 3d 1065 (2006). Again, it is significant to the probable cause analysis that the computer search whittled down all possible addresses to just two. Even supposing the police could not credit one address over the other, they were not starting from scratch.

Next, the officers proceeded to 1855 Sunnydale to locate Whitfield, but they received mixed results once they arrived. Whitfield's mother answered the door and clearly stated that he did not live there. Doc #10 Ex G at ¶16. On the other hand, the mother's statement to police searching for her son may warrant pause by a reasonable officer but does not negate all other credible evidence. See Motley, 432 F 3d at 1082 ("[The resident's] statement that [the defendant] did not live at that address, coming from a less-than-disinterested source, did not undermine the information the officers previously had received * * * . It is not an unheard-of phenomenon that one resident will tell police that

15

another resident is not at home, when the other resident actually is hiding under a bed when the police come to call."). Such skepticism does not imply that all de-escalating statements to police are untrustworthy. Here, it means only that her statement to the police was not the end of the story.

The officers had met Daniels at the hospital and helped her fill out a restraining order, but the statements in that document are unclear. Id. Whitfield claims the protective order shows he was living at 967 Drake because the order requires him to "stay away at least 150 yards from" and "move out immediately from 967 Drake Ave, Marin City 94965 and 1133 Brussels." Doc #9 Ex B. The latter address is Daniels's mother's house. Whitfield contends the "move out" languange means the police "knew" he "lived" at 967 Drake. See Doc #9 at 10-11. On the other hand, the "move out" language does not necessarily imply residence – it might simply require him to remove any of his belongings from those premises. More importantly, the "move out" phrase is form language, and the court declines to read too much into it. The government, for its part, argues the protective order also states Daniels told the police that Whitfield "'dragged her out of his apartment,' referring to the house at 1855 Sunnydale Avenue." Doc #10 at 11. This statement was written into the order by Officer Ortiz and therefore does not much amplify the statement in his declaration. Again, this evidence does not necessarily cut one way or the other except to show once again that the police narrowed Whitfield's residence down to two possibilities, one of which was 1855 Sunnydale.

16

The next day, immediately after Whitfield was arrested and taken to the station, but before the search of 1855 Sunnydale, the police conducted another address search. This computer search "revealed that Whitfield was subject to a warrantless search condition as a condition of court probation through 06/21/2009." Doc #10 Ex M. Officer Reboli further states that "[a] criminal history report stated Marcus Whitfield's home address is 1855 Sunnydale Avenue in San Francisco." Id Ex H at ¶9. Officers Kobold, Campos and Trail all state verbatim that "Whitfield's home address of 1855 Sunnydale Avenue, San Francisco, CA is on file with the San Francisco Probation Department and is reflected in Mr. Whitfield's criminal history." Id Ex I, J, K. Sargeant Sainez ordered the four officers "to respond to the residence at 1855 Sunnydale Ave in order to investigate." Id Ex M.

The facts surrounding this records search are not entirely clear. The officers do not explicitly state, as did Officer Ortiz, that they found the 1855 Sunnydale address through a computer search. The officers do not state whether they personally learned the address by reading a computer report, by phoning the San Francisco Probation Department, by reading Whitfield's entire file at the police station or by other means. And although the discrepancy cries out for an explanation, the officers do not address why they were only able to find one address whereas Officer Ortiz was able to find two. Under the "reasonably cautious man" standard, see Howard, 447 F 3d at 1262, the officers perhaps should have done more. But complete certainty is not required. This

17

records search unequivocally pointed to 1855 Sunnydale Avenue as Whitfield's residence.

Finally, Whitfield contends that once the officers arrived at 1855 Sunnydale to perform the search, they should have discovered he did not reside there. Specifically, the officers asked Whitfield's sister if Whitfield "stays or lives" at 1855 Sunnydale, to which she answered "yeah, he stays here." Doc #9 Ex C at 4. Again, the court is unconvinced that the phrasing of that question – and a fifteen-year-old girl's response to it – would alone be decisive, but it is a factor.

In assessing probable cause, the court must not lose sight of the total picture. Here, all the circumstances in combination suggest the police had probable cause to believe Whitfield resided at 1855 Sunnydale Avenue. The domestic battery occurred there, the victim stated Whitfield lived – or at least stayed – there and that address appeared on two out of three searches of his record. Moreover, that address was not random – it belonged to Whitfield's family. It was not a transitory address belonging to a friend or acquaintance. The 1855 Sunnydale address was probably the most reliable indicator of Whitfield's stable residence.

In a circumstance where the police know that one out of no more than two addresses is valid but cannot state which one with certainty is correct, the police should not be powerless to act. See United States v McClain, 444 F 3d 556, 568-69 (6th Cir 2005) (Boggs, J, concurring) ("If that were the case, one could never get a search warrant to search all three cars of a person for whom

18

there was overwhelming evidence of general drug dealing, and specific evidence of a drug transaction the proceeds of which were now certainly in one of three cars in his garage, and certainly not in any of the others."). The police, in addition to having these two addresses from the probation and parole records, had other credible information pointing to Whitfield's residence at 1855 Sunnydale. The probability associated with Whitfield's residence there is not cancelled out simply because there may have been some contrary evidence. The test is an objective one and the evidence mounted that threshold.

III

Because the police had probable cause to believe Whitfield resided at 1855 Sunnydale Avenue, the probationary search of that address was valid, with or without consent. Accordingly, Whitfield's motion to suppress is DENIED. A hearing is set for Thursday, October 11, 2007 at 1:30pm for further proceedings.

IT IS SO ORDERED.

VAUGHN R WALKER

United States District Chief Judge